IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

BROOKE E. RYAN                                                                                              PLAINTIFF

VERSUS                                                              CIVIL ACTION NO: 1:04cv31WJG-JMR

ANN M. VENEMAN, Secretary,
United States Department of Agriculture                                                      DEFENDANT

MEMORANDUM OPINION

This cause comes before the Court on the motion of the Defendant, Ann M. Veneman, Secretary, United States Department of Agriculture [USDA] for summary judgment [24-1] for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).  The Court, being fully advised in the premises and having examined the briefs and complaint in this case, finds as follows.

Statement of Facts

Brooke E. Ryan filed this lawsuit pursuant to Title VII of the Civil Rights Act of 1964 [Title VII], 42 U.S.C. § 2000, *et seq.*  (Ct. R., Doc. 1, p. 1.)  Ryan, a student intern was appointed in July 1996 under the Student Temporary Employment Program [STEP].  (Pl.'s Resp., p. 1.) She was employed at the USDA's Harrison Experimental Forest Station [HEFS], a forest genetics laboratory located in rural Saucier, Mississippi.  (*Id.*)

Ryan was assigned to work under the supervision of Dr. Thomas Kubisiak, a research geneticist.  Kubisiak worked closely with Ryan and eventually the two began dating.  The couple dated from December 1996 until March 1997.  (Summ. J. Mot., Exh. 2., p. 30.)  When they

began dating, Kubisiak asked to be relieved of his supervisory duties over Ryan. (*Id*., p. 47.) Kubisiak and Ryan became engaged to be married, but Ryan broke off the engagement after several months. (*Id*., p. 41.)

Kubisiak then began attempts to woo Ryan back to him, asking her to hug or kiss him and making excuses to find her alone and talking her into entering back into a relationship with him. (*Id*., p. 3.) When none of these efforts made a difference in their relationship, Kubisiak began acting in anger, making derogatory comments about Ryan and criticizing her work and behavior at work. (*Id*.)

In August 1997, Kubisiak became aggressive toward Ryan; yelling, slamming doors, cursing her or forcing physical contact. (*Id*., pp. 51-78.; Pl.'s Resp., Exh E, p. 3.) Ryan complained about Kubisiak's behavior toward her to her supervisor, Dr. Rob Doudrick. (*Id*., p. 75; Exh. E, p. 4.) Kubisiak was admonished and instructed to stay away from Ryan and stay out of her work affairs. (*Id*.) On January 5, 1998, Doudrick gave Kubisiak a memorandum confirming their conversation regarding Kubisiak's behavior toward Ryan. (*Id*., Exh. 3.) Nevertheless, Kubisiak ignored these instructions and began behaving irrationally. (*Id*., Exh. F.) Ryan went on administrative leave during Christmas 1997. (*Id*., p. 63.)

Ryan went to work in office automation in either 1998 or 1999. (*Id*., Exh. 2, p. 21.) Her supervisor was Kaye Mansfield. (*Id*., p. 22.) In October 2000, Kubisiak complained to the project leader, Dr. Floyd Bridgwater, that Ryan was not getting her work done and was using office equipment for personal use. (*Id*., p. 83.) Ryan was told she could use the equipment for personal use so long as that use did not interfere with her work assignments. (*Id*., pp. 83-5.) She

was assured that her work performance was satisfactory.  (*Id*.)  Kubisiak was issued another written reprimand based on this incident on November 7, 2000.  (*Id*., Exh. 4.)

In April 2001, Kubisiak again complained that Ryan was using the office computer for personal work after he examined her computer while loading software onto her computer.  (*Id*., pp. 87-9.)  Ryan was eventually assigned to work from home, allegedly because of her fear of Kubisiak, in May 2001.  (*Id*., pp. 89-92.)  She eventually returned to the facility, in an isolated spot in the county.  Ryan's coworkers were instructed to call the sheriff if any problems arose between Ryan and Kubisiak on site.

Ryan filed an administrative grievance  with the United States Forest Service [Forest Service] on May 11, 2001, claiming she was subjected to a hostile work environment which management failed to correct.  Ryan was advised on September 28, 2001, that she could not use the administrative grievance procedure to prosecute an Equal Employment Opportunity [EEO] complaint.  Ryan then initiated the EEO complaint process by contacting an EEO counselor on October 3, 2001.  She received notice of her right to file a formal complaint of discrimination on January 22, 2002, and the complaint was accepted for investigation on June 20, 2002.  The Final Agency decision which determined that Ryan had been discriminated against was issued on October 17, 2003.

According to the Defendant, any claim prior to 45 days before October 3, 2001, are time barred.  (Summ. J. Mot., p. 5.)  Failure to notify an EEO counselor or to timely file a formal complaint concerning a situation equates with failure to exhaust administrative remedies and is cause for dismissal of a claim, according to the Defendant.  (*Id*.)  Under federal regulations, a

federal employee must contact an EEO counselor within 45 days of the alleged discriminatory incident. (*Id.*, p. 6.)

The Defendant further alleges that Ryan failed to establish an employment discrimination claim based on gender. (*Id.*) The USDA claims that Ryan was not subjected to sexual harassment in a hostile work environment. (*Id.*, p. 8.) The type of behavior of which Ryan complained is not sufficient to establish a hostile work environment, according to the Defendant. (*Id.*, pp. 8-11.)

The USDA claims that there is no evidence that any contact of a sexual nature occurred after December 1997. (*Id.*, p. 11.) Ryan testified in her deposition that after she reported Kubisiak's behavior to Doudrick, she was no longer bothered by Kubisiak's attempts to touch her. (*Id.*, Exh. 2, pp. 75-6.) According to the USDA, Ryan's deposition testimony establishes that Kubisiak did not make any further sexually suggestive comments; did not contact her and did not attempt to renew their relationship after December 1997. (*Id.*) The USDA contends that the conduct which the Plaintiff finds offensive did not occur with the same frequency and was too distant to constitute a viable claim for an alleged sexual hostile work environment. (Summ. J. Mot., p. 12.) The USDA asserts that any claims concerning offensive touching are time-barred and not egregious enough to constitute sexual hostility. (*Id.*, p. 12.) Any criticisms voiced by Kubisiak during 1997 and 2001 were either not based on Ryan's gender or not severe enough to establish that Ryan was subject to a sexually hostile work environment, according to the Defendant. (*Id.*, pp. 12-14.)

The Defendant argues that the criticisms were most likely rendered because of a personal dislike, grudge or workplace dispute rather than being based on Ryan's gender. (*Id.*) The

Defendant contends that in situations such as these, residual ill feelings stemming from a failed sexual relationship do not constitute sexual harassment. (*Id.*, pp. 15-18.) The USDA argues that Ryan has established nothing more than a situation involving personal animosity and not sexual harassment. (*Id.*, p. 18.)

None of the Plaintiff's complaints regarding Kubisiak affected a term or condition of her employment, according to the Defendant. (*Id.*) Ryan's supervisors defended her work when Kubisiak criticized her performance, and she was allowed to work from home to avoid Kubisiak's scrutiny. (*Id.*, pp. 18-19.) The Defendant argues that none of the incidents altered Ryan's conditions of employment. (*Id.*, p. 19.) The USDA claims that although Ryan may have felt her workplace was "hellish" because of Kubisiak's actions, the incidents do not amount to objective harassment. (*Id.*)

According to the USDA, prompt remedial action was taken when the agency discovered the Kubisiak was bothering Ryan because he was issued two cautionary letters about the 1997-98 incidents. (*Id.*, p. 20.) Also, on November 7, 2000, Kubisiak received a written reprimand from Bridgewater stating that further disciplinary action would be taken against Kubisiak if an issue arose between Ryan and Kubisiak. (*Id.*)

Ryan's claims include allegations of intentional infliction of emotional distress and negligent hiring. (*Id.*, pp. 20-21.) According to the USDA, Ryan failed to file an administrative tort claim with the Forest Service. (*Id.*, p. 21; Frances Austin Decl., Para. 5.) An administrative tort claim must be filed before filing suit based on tort, argues the USDA, citing 28 U.S.C. sections 2675(a) and 1346(2). (*Id.*)

The USDA contends that Ryan has failed to state a claim for damages based on her voluntary separation from the HEFS because she was employed under the STEP program which is a temporary position and does not convert to either a career ladder or conditional position. (*Id.*, pp. 21-2.)  At times Ryan served as a contract employee, and a person employed on a contract basis is not automatically eligible for conversion of that position to a career ladder or career conditional position.  (*Id.*; Frances Austin Decl., Para. 2-5.)  Ryan stated that she understood that her position was temporary and that she had no expectation of continued employment at the USDA.  (*Id.*, Ryan Depo., p. 8.)

Ryan asserts that she was involved in a continuing violation which began outside of the statutory limitation period but continued into the limitations period so that all the alleged discriminatory acts could be considered as part of a pattern or policy and therefore, timely.  (Pl.'s Resp., p. 5.)  She contends that another employee, Mary Mason, reported Kubisiak's actions to the director of the HEFS.  (*Id.*, Exh. E, p. 3.)  Mason stated that in January 1998, the department entered into an informal EEO complaint process.  (*Id.*, p. 5.)  Mason indicated that she informed Ryan of her rights under the EEO procedures and that Ryan was reluctant to follow through with those procedures.  (*Id.*, p. 6.)  Mason provided that Kubisiak's behavior even made her feel uncomfortable working in the lab because of the level of his anger.  (*Id.*)  Mason also stated that she observed Kubisiak's behavior toward another female student intern including touching and inappropriate sexual comments during 1998 to such an extent that the entire office discussed the situation.  (*Id.*, p. 6.)

Although Kubisiak was admonished for his behavior he continued to react in anger at Ryan and ignored instructions to leave her alone.  (*Id.*, Exhs. A-B, G.)  Ryan asserts that although

the USDA recognized Kubisiak's obsession with Ryan, she was reassigned jobs and sent home to work, rather than taking remedial action against Kubisiak. (Pl.'s Resp., p. 3, Exh. F.) Furthermore, Ryan contends that when she returned to work, her coworkers were instructed to call the sheriff's department should any trouble arise between she and Kubisiak. (*Id*., p. 4.)

Ryan first formally contacted an EEO counselor on October 3, 2001. She began voicing complaints and seeking help from her supervisors immediately after the problems, and a co-worker submitted a written complaint regarding the incidents described by Ryan. (Summ. J. Mot., Exh. E.) Dr. Ron Schmidtling submitted an affidavit to the Forest Service during its investigation of the incidents between Kubisiak and Ryan. (*Id*., Exh. F, p. 1.) Ryan worked with Schmidtling after she was transferred in 1998 to minimize her contact with Kubisiak. (*Id*., p. 3.) Schmidtling stated that Ryan did not work at the lab for a period of time to avoid contact with Kubisiak, and stated that while she was at the lab, she was careful to avoid contact with Kubisiak. (*Id*., p. 4.)

When Kubisiak reported that Ryan had personal material on her work computer, and Schmidtling advised Kubisiak that it was not appropriate to be examining the files on Ryan's computer, especially as Kubisiak was told not to interact with Ryan. (*Id*.) Ryan was upset because her computer files were examined and indicated she believed she was being stalked. (*Id*., p. 5.) She inquired of Schmidtling whether he thought Kubisiak was capable of violence, and although Schmidtling said he did not think Kubisiak would be, he noted that he could not be certain, because Kubisiak acted irrationally when he was angry. (*Id*.) Schmidtling reported the conversation to Ryan's supervisor, and Ryan was moved to work in another building, and later assigned to work from home. (*Id*.)

Ryan complained to her supervisor, Kaye Mansfield, after Ryan stated she felt threatened by Kubisiak when he came into her work area slamming things around. (*Id*., Exh. G, p. 3.) This incident happened in April 2000, and Ryan was assigned to work from home after the incident. Mansfield indicated that Ryan worked from home for about a year and a half. (*Id*., p. 2.) Mansfield reported the problems to her supervisor and to the human resource department. (*Id*., p. 5.)

From August 1997 until her resignation in August 2000, Ryan was apparently subjected to violent and aggressive behavior directed toward her from Kubisiak in that he would slam doors and cabinets, curse her, speak rudely to her and criticize her in the workplace about her work performance and overall personality. (*Id*., Exh. A, p. 1.) Doudrick, the acting project leader, issued two cautionary letters in April 1998 to Kubisiak regarding interactions with Ryan, in which Kubisiak was told he would not be kept beyond his probationary period scheduled to end in August 2000, if he continued to bother Ryan. (*Id*., p. 6; Pl.'s Resp., Exh. A, p. 6.)

Apparently, Kubisiak was retained beyond his probationary period despite the warnings issued by his supervisors. (Pl.'s Resp., Exh. A.) The project supervisor, Bridgwater, issued a reprimand to Kubisiak on November 7, 2000. (Summ. J. Mot., Exh. 4.) Bridgwater reprimanded Kubisiak on April 23, 2001, referencing the November 2000 letter which outlined that further disciplinary action would be taken against Kubisiak if any further complaints were received regarding his behavior. (Pl.'s Resp., Exh. A, p. 8.) Dr. Bridgwater told the administrative secretary to move Ryan out of the scientist's office building to the administrative offices to minimize contact between Ryan and Kubisiak, and to ensure that a third person would be present if another incident occurred between the two in April 2001. (*Id*.) In May 2001,

Page -8-

Bridgwater contacted the employee relations specialist indicating his concern regarding Kubisiak's behavior and indicating a need for further disciplinary action taken against Kubisiak. (*Id.*, p. 9.) Bridgwater acknowledged telling the administrative staff to call law enforcement if the need arose in any incident involving Kubisiak. (*Id.*, p. 10.) A letter of caution was issued to Kubisiak in June 2001 which outlined several discussions with him concerning his behavior and reiterating that further disciplinary action would be taken against him if his behavior did not change. (*Id.*) In July 2001, Bridgwater issued a warning letter to Kubisiak informing him that he needed to discuss the June 2001 cautionary letter with him and sign an acknowledgment of the discussion. (*Id.*) The discussion was held, but Kubisiak refused to sign the acknowledgment. (*Id.*)

      The project leader informed Ryan that the investigation of her complaints regarding Kubisiak were resolved and that she would no longer work from home. (*Id.*) Bridgwater went on to state that certain safeguards were put into place to insure her personal safety at the work place. (*Id.*) Those safeguards included instructing the staff in the administrative building not to leave her alone in the building; to report any unacceptable behavior immediately to the project leader; and should Kubisiak become belligerent, the staff was instructed to call law enforcement and have him escorted from the building. (*Id.*, pp. 10-11.) The project leader further informed Ryan that he was concerned about her welfare. (*Id.*, p. 11.)

      When Ryan indicated she was still uncomfortable about returning to work, she was allowed to continue to work from home until September 2001. (*Id.*) The project leader indicated that the situation was resolved by allowing Ryan to continue working from home, and by restoring her leave balance and paying out of pocket medical expenses. (*Id.*, pp. 11-12.)

Standard of Review

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 877 (5th Cir. 2003). All disputed facts are resolved in favor of the party opposing the summary judgment. *Walker v. Thompson*, 214 F.3d 615, 624 (5th Cir. 2000). The moving party bears the burden of establishing that there are no genuine issues of material fact. The nonmoving party may not rely upon mere allegations or denials within the pleadings, but must come forward with specific facts showing the presence of a genuine issue for trial. *Whelan v. Winchester Prod. Co.,* 319 F.3d 225, 228 (5th Cir. 2003).

Discussion

Ryan asserts claims under Title VII of the Civil Rights Act of 1964, for sexual harassment, hostile work environment, and intentional infliction of emotional distress. (Ct. R.,Doc. 1.) The Defendant seeks summary judgment on all claims and further asserts that any claims made prior to October 3, 2001, are time-barred because Ryan allegedly failed to notify an EEO counselor or file a formal complaint about her claims. (Summ. J. Mot., p. 5.)

I.  Timeliness

The regulations applying Title VII's anti-employment discrimination provisions to federal employees require employees "who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age or handicap" to contact an EEO counselor "within 45 days of the date of the matter alleged to be discriminatory . . . ." 29 C.F.R. § 1614.105(a)(1). Once a federal employee has participated in, and exhausted, the administrative process, she may bring suit in federal court under Title VII. *See Tolbert v. United States,* 916 F.2d 245, 247 (5th

Cir. 1990). Should the federal employee fail to exhaust her administrative remedies, the district court cannot adjudicate the employee's Title VII claim. *Fitzgerald v. Secretary, U.S. Dep't of Veterans Affairs,* 121 F.3d 203, 206 (5th Cir. 1997); *see Brown v. General Servs. Admin.,* 425 U.S. 820, 832 (1976).

According to Ryan, she need not establish that all of the acts fall within the requisite time period because the alleged discrimination constituted a series of related acts so that the alleged discrimination became a continuing violation. (Pl.'s Resp., p. 5.) When the employer is engaged in an ongoing pattern of discriminatory behavior, the actions may be called a "continuing violation." To determine if the employer's conduct constitutes a continuing violation, the court must review "the facts and context of each particular case." *Berry v. Board of Supervisors of LSU,* 715 F.2d 971, 981 (5th Cir. 1983). This includes consideration of whether the acts involved the same type of discrimination; are related and recurring rather than isolated incidents; and whether the acts are pervasive enough to trigger an employee's awareness of and duty to assert her rights, or are the type of actions which do not indicate a continuing intent to discriminate. *Berry,* 715 F.2d, at 981-2. Should the employee establish an ongoing pattern of behavior, a plaintiff may complain of otherwise time-barred discriminatory acts if it can be shown that the discrimination manifested itself over time, rather than in a series of discrete acts. *See Huckabay v. Moore,* 142 F.3d 233, 238-9 (5th Cir. 1998); *Frank v. Xerox Corp.*, 347 F.3d 130, 136 (5th Cir. 2003). The continuing violation theory requires the same type of discriminatory acts to occur both inside and outside the limitations period. *See Berry,* 715 F.2d at 979.

In particular, a hostile work environment claim may be a "continuing violation" where the workplace harassment has continued into the actionable period because a hostile work environment claim is "not the kind of violation that, like a discrete instance of discriminatory conduct, would put a worker on notice that [her] rights had been violated." *Huckabay,* 142 F.3d at 239. The "continuing violation" doctrine, is an equitable remedy that "relieves a[n aggrieved employee alleging discrimination] . . . from the burden of proving that the entire violation occurred within the actionable period provided the plaintiff can show a series of related acts, one or more of which falls within the limitations period." *Webb v. Cardiothoracic Surgery Assocs. of N. Tex.,* 139 F.3d 532, 537 (5th Cir. 1998) (citing *Messer v. Meno,* 130 F.3d 130, 134-35 (5th Cir. 1997)).

Viewing the facts in the light most favorable to the Plaintiff, the Court finds that Ryan has established a question of fact regarding whether the alleged discriminatory acts were so pervasive and ongoing to constitute a continuing violation. First she was subjected to Kubisiak's attempts to hug and kiss her at the workplace which later escalated to angry out bursts, name calling and threats to have her fired. When she voiced her concerns to her co-workers and supervisors, warnings were issued to Kubisiak to avoid interaction with Ryan, which Kubisiak chose to ignore. His angry behavior continued toward Ryan over a period of time, to the extent that the entire facility was advised to call the sheriff if problems arose between Ryan and Kubisiak. Ryan discussed the situation with her supervisors, and although she was advised of her EEO rights, according to the affidavits presented in the case, she may not have been told that the situation constituted actionable harassment. The Court concludes that escalating pattern of Kubisiak's unacceptable behavior toward Ryan continued over a period of time and is connected

to the initial incident, and that Ryan has established a question of fact regarding her claim of harassment. Accordingly, the Court concludes that the Defendant's motion for summary judgment on her discrimination claims because of a failure to timely exhaust her remedies should be denied.

II.     Failure to Establish Evidence of a Sexual Hostile Working Environment

The Defendant also contends that summary judgment should be granted because Ryan has shown nothing more than a personal dispute between two individuals who formerly dated, rather than harassment based on her gender. (Summ. J. Mot., p. 14.) The plaintiff in a hostile work environment claim must establish that: (1) she belongs to a protected class, (2) she was subjected to unwelcome sexual harassment, (3) the harassment was based on sex, (4) the harassment affected a term, condition, or privilege of employment, and (5) the employer knew or should have known of the harassment and failed to take remedial action. *Mota v. Univ. of Tex. Houston Health Sci. Ctr.,* 261 F.3d 512, 523 (5th Cir. 2001).

The Defendant maintains that the harassment Ryan was subjected to was not based on her sex, but rather on the failed relationship between Ryan and Kubisiak. Ryan has brought forth evidence that Kubisiak may also have subjected another female employee to a similar sort of work environment. In addition, Ryan presented information through the affidavits of her co-workers that Kubisiak's behavior caused those individuals to be concerned for her welfare. There is no evidence that male employees were subjected to the same sort of treatment from Kubisiak. This type of harassment goes beyond the acts of a disappointed suitor and reflects possible gender discrimination. *See Green v. The Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 655

(5th Cir. 2002). The Court concludes that Ryan has presented a jury question regarding whether Kubisiak's conduct was sufficiently severe or pervasive to create a hostile work environment.

Although the Defendant argues that Ryan suffered no adverse consequences as a result of these incidents, there remains a question of fact whether Kubisiak's behavior toward Ryan altered her conditions of employment and drove her to seek other employment rather than pursue full time employment at the facility following her graduation. The evidence supports a finding that Kubisiak's actions interfered with Ryan's work performance, that he bothered her to the point she believed he was stalking her and caused herself and others to be concerned for her safety and he cursed at and humiliated her. Under these circumstances, whether the USDA's reprimands were sufficient to determine that the Defendant took prompt remedial action in this situation is a question of fact for the jury to determine. *See Waltman v. International Paper Co.*, 875 F.2d 468, 479 (5th Cir. 1989). The Court, therefore, concludes that the motion for summary judgment on Ryan's sexual harassment and sexually hostile work environment claims should be denied. *Green*, 284 F.3d at 655.

III.     Intentional Infliction of Emotional Distress

Finally, the Defendant maintains that any claims of intentional infliction of emotional distress or negligent hiring should be dismissed because Ryan failed to file an administrative claim as required under the statutes as a prerequisite to suit in federal court based on tort claims against the federal government. (Summ. J. Mot., p. 21.) There is no evidence that such a claim was filed in this case. (*Id.*, Frances Austin Decl., p. 5.) "Exhaustion of administrative review is a jurisdictional requisite to suit under the Tort Claims Act and absent compliance with the statute's requirement" the court lacks jurisdiction over such a claim. *McAfee v. Fifth Cir.*

*Judges*., 884 F.2d 221, 222-3 (5th Cir. 1989).  The Court concludes that because Ryan failed to exhaust the required administrative review process, the Defendant's motion for summary judgment on her claims of negligent hiring and intentional infliction of emotional distress should be granted.

Conclusion

For the reasons given above, this Court finds that the Defendant's motion for summary judgment [24-1] should be granted in part and denied in part.  The Court concludes that the motion for summary judgment on allegations that Ryan failed to exhaust her administrative remedies and on her sexually hostile work environment claim should be denied.  The Court further finds that the motion for summary judgment on claims of intentional infliction of emotional distress and negligent hiring should be granted.  A separate summary judgment in conformity with and incorporating by reference the above Memorandum Opinion shall issue this date.  Each party shall bear their respective costs associated with this motion.

THIS the 13th day of February, 2006.

*Walter J. Gex III*
UNITED STATES SENIOR DISTRICT JUDGE